

FILED
3:37 pm, May 18, 2020

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| KOFI AJABU | ) Case No. 2:20-cv-00257-JRS-DLP |
| | ) |
| Petitioner, | ) |
| | ) |
| | ) EMERGENCY PETITION FOR WRIT OF |
| v. | ) HABEAS CORPUS, INJUNCTIVE, AND |
| | ) DECLARATORY RELIEF |
| | ) |
| ERIC J. HOLCOMB, | ) |
| GOVERNOR OF INDIANA | ) IMMEDIATE RELIEF SOUGHT |
| AND | ) |
| ROBERT E. CARTER, JR., | ) |
| COMMISSIONER OF DOC | ) |
| KRISTINA M. BOX, | ) |
| STATE HEALTH COMMISSIONER, | ) |
| Respondents. | ) |

## INTRODUCTION

1.      The COVID-19 pandemic has taken more American lives in the span of one month than the entire Vietnam War.  Governors and legislature have boasted that they have taken great precautions to protect the people within their borders by issuing directives to stay home and to social distance to slow the spread.  The pandemic has affected everyone in the state of Indiana, the old the young, the rich the poor, the religiously devoted and the steadfast agnostic, the free and those behind prison walls.  Every class of citizen realizes that in order to survive the novel corona virus, life, as we know it must change.  Every citizen class looks to the government to help keep them safe in this emergency.

2.      A collective voice that is out of sight and therefore out of mind is the voice of the criminally convicted.  They have no ballot to pull in November.  They cannot sway the election because they cannot vote.  They cannot pick up the phone and call their congressional representative.  They can be completely ignored by the

legislature and the government for the most part because they are incarcerated and do not enjoy many of the essential liberties of the general population.  However, there is one provision in the United States Constitution and that is the 8th Amendment, which prohibits cruel and usual punishment.  But for this constitutional provision, the prison inmate seemingly would have no voice or recourse.

3.      COVID-19 has come across the man-made barriers and has infiltrated those inside the prison walls of every prison in the state of Indiana and Wabash Valley Correctional Facility is no exception to this invasion.  COVID-19 has already killed both inmates and custodial staff.[1]  Unlike the general population where citizens are able to create separation from the sick, Wabash Valley creates an environment where contracting the disease is inevitable.  The question is not a matter of *if* but a matter of *when*.

4.      The most respected medical professionals have instilled some hope by saying only the elderly are likely to die, that theory has been debunked, that only the sickly are likely to die, that theory has been debunked, that only those with substantial consistent contact with a sick person will likely contract the disease, that theory has been debunked, that only those who have symptoms can pass the disease, that theory has been debunked, that 14 days after the appearance of symptoms there is no more need to be concerned, that theory has been debunked, that the virus will be gone by April, that theory has been debunked, that once you

---

[1] Correctional officer at Wabash Valley Correctional Facility dies due to COVID-19 https://www.theindychannel.com/news/coronavirus/correctional-officer-at-wabash-valley-correctional-facility-dies-due-to-covid-19

get it, you can't get it again, that theory has been debunked.  What we now know is that we know very little about COVID-19 except for the fact that it is highly contagious and it kills or permanently maims.

5.      It has been proven that people of African descent are more likely to die from the disease as well as those who are older and who have preconditions.[2]  It has also been proven that individuals under stressful circumstances are likely to suffer more when compared to those individuals that are not in stressful circumstances.  But there are so many unanswered questions that certainly add more stress to the general population and that stress is even more devastating to our population of citizens that are held in prison cells.

6.      Those in prisons are under constant stress without the added stress that COVID-19 presents.[3] It has been proven that stress impacts the immune system.[4]  When people are chronically stressed, the inflammatory system becomes over-activated, which can trigger disease.[5]  Chronic stress is linked to heart disease, diabetes, and cancer.[6] These illnesses in the face of COVID-19 can be deadly.[7]  Stress

---

[2] Why are Blacks dying at higher rates from COVID-19?
https://www.brookings.edu/blog/fixgov/2020/04/09/why-are-blacks-dying-at-higher-rates-from-covid-19/
[3] Being "on Point": Exploring the Stress-related Experiences of Incarceration
https://www.asanet.org/sites/default/files/attach/journals/mar19smhfeature.pdf
[4] Can Stress, Loneliness and Sleep Deprivation Make You More Prone to COVID-19?
https://www.discovermagazine.com/health/can-stress-loneliness-and-sleep-deprivation-make-you-more-prone-to-covid-19
[5] *Id.*
[6] *Id.*
[7] *Id.*

also hinders the body's ability to fight off disease.[8] COVID-19 presents a disastrous situation for an already stressed population.

7.      We still don't know the lasting effects from the disease.  The lives of those who are fortunate enough to survive may find themselves on dialysis for the rest of their lives or without a limb due to amputation or a life of congestive heart failure or any number of diseases brought on by the bout with COVID-19.  We still have no clue what lies in store for those who are the so-called survivors.

8.      Governor Holcomb makes a regular press briefing and often uses the tag line "We are in this together" but the state obviously did not mean for that phrase to apply to those incarcerated.  Those citizens in Wabash Valley Correctional Facility have come to the conclusion that their lives do not matter as much as those in the general population.  The fact is, if a citizen contracts the virus outside the prison walls, the government is not to blame however inside Wabash Valley the government must take all the blame because if the proper precautions were in place the disease could never spread in a controlled environment.

9.      Petitioner seeks intervention from this Court in this matter of a life and death situation.

## I.  JURISDICTION AND VENUE

10.      Petitioner brings this action pursuant to 28 U.S.C. § 2241 for relief from detention that violates his Eighth Amendment rights under the U.S. Constitution.

---

[8] Stress, Illness and the Immune System https://www.simplypsychology.org/stress-immune.html

11.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1651 (All Writs Act); Article I, § 9, cl 2 of the US Constitution (Suspension Clause); 28 U.S.C. § 1331 (federal question jurisdiction).

12.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Petitioner is in custody in this judicial district and venue.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Petitioner's claim occurred in this district.

## II. PARTIES

13.     Petitioner, Kofi Ajabu, is an inmate in the Wabash Valley Correctional Facility in Carlisle, Indiana.  The Wabash Valley Correctional Facility was the first prison in the State of Indiana to suffer a death of a prison officer due to COVID-19.[9] Prison Officer Gary Weinke, the officer killed by COVID-19, worked in the very same cell-block that Kofi is housed in.  Officer Weinke and several others in Wabash Valley Correctional Facility have contracted COVID-19.  Kofi has interacted with Officer Weinke's

14.     When Officer Weinke's sickness became too serious for him to work, Petitioner became extremely concerned for his own life.  When Officer Weinke died, the fear of dying that same horrible agonizing death became overwhelming for Kofi.

---

[9] Indiana Correction Officer Dies of Convid-19 Complications
https://indianapublicmedia.org/news/indiana-correction-officer-dies-of-covid-19-complications.php

15.     Petitioner is a 47 year-old African American male and has suffered from health complication including seizures, concussion and post concussion syndrome following a traumatic brain injury.  He suffers from chronic stress and has been indefinitely placed in "the hole" also known as solitary confinement because of the stress he is suffering from.  The stress has affected both his physical and mental health.  His isolation exacerbates the stress because his placement causes him to suffer from loneliness in addition to the fear of being away from normalcy and fear of contracting COVID-19.  Being placed in solitary confinement has caused Kofi to suffer from anxiety, panic, insomnia, paranoia and depression.  Placement in solidary confinement has been long associated with lasting mental health ailments.[10] Solitary confinement cannot be a long-term prevention plan or form of treating and preventing COVID-19 in the prisons. [11]

16.     Respondent, Eric J. Holcomb, is the Governor of the state of Indiana and has the authority and responsibility to insure that the Wabash Valley Correctional Facility is a safe environment for its inmates.

17.     Respondent, Robert E. Carter, Jr. is the Commissioner of the Indiana Department of Corrections and is responsible for insuring that the Wabash Valley Correction Facility is a safe environment for its inmates.

---

[10] Alone, in 'the hole' Psychologists probe the mental health effects of solitary confinement. https://www.apa.org/monitor/2012/05/solitary
[11] The Effects of Solitary Confinement on the Brain
Neurobiology shows the need to make solitary confinement more humane.
https://www.psychologytoday.com/us/blog/brain-chemistry/201902/the-effects-solitary-confinement-the-brain

18.     Respondent, Dr. Kristina M. Box, state Health Commissioner for the State of Indiana took a Hippocratic oath to do no harm but her silence and failure to move inmates out of the prisons is doing the harm.  Dr. Box not only has the authority but also the mandate to insure that inmates housed in the prison's in the state of Indiana are protected.

### III. FACTUAL ALLEGATIONS

### A.  COVID-19 Poses a Significant Risk of Illness, Injury or Death

19.     The novel coronavirus that causes COVID-19 has led to a global pandemic,[12] and The United States has more confirmed cases of COVID-19 than any other country in the world.  As of May 1, 2020, there were more than 3 million reported COVID-19 cases throughout the world and more than 63,000 deaths in the United States[13].  Projections indicate that hundreds of thousands of people in the United States may die from COVID-19, accounting for existing interventions.[14]

20.     "COVID-19 is twice as contagious as the flu, and 20 times more deadly."[15]  The virus is "highly infectious," and can be spread "easily and sustainably" from person-to-person.[16]  The virus can live on plastic and steel

---

[12] Betsy McKay et al., Coronavirus Declared Pandemic by World Health Organization, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

[13] See Johns Hopkins University of Medicine, Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University, https://cutt.ly/StEyn2U.

[14] Rick Noack, et al., White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts, WASH. POST. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.

[15] Governor Mike DeWine (@GovMikeDeWine), Twitter (Mar. 14, 2020, 2:19PM), https://twitter.com/GovMikeDeWine/status/1238892579262992384?s=20

[16] See Centers for Disease Control and Prevention, How COVID-19 Spreads (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

surfaces for up to 72 hours,[17] and, powered by a single cough or sneeze, can be

propelled in a gas cloud that extends up to 27 feet in length.[18]

21.     Because the coronavirus spreads even among people who do not

show symptoms, staying away from people is the best way to prevent infection.[19] In

other words, everyone—including officials at Wabash Valley Correctional Facility —

has to act as if everyone has the disease.

22.     There is no vaccine against COVID-19, and there is no known

medication to prevent or treat infection. Social distancing—deliberately keeping at

least six feet of space between persons to avoid spreading the illness[20]—

supplemented by a vigilant hygiene regimen, including washing hands frequently

and thoroughly with soap and water, is the only known effective measure for

protecting against transmission of COVID-19.

23.     As a result, the only assured way to curb the pandemic is through

dramatically reducing contact for all.[21] Consequently, every American institution—

---

[17] Neeltje van Doremalen et al., Aerosol and Surface Stability of SARS-CoV-2 as
Compared withSARS-CoV-1, NEW ENG. J. MED., 2 (2020), available at
https://www.nejm.org/doi/10.1056/NEJMc2004973 (accessed Apr 30, 2020).
[18] Lydia Bourouiba, Turbulent Gas Clouds and Respiratory Pathogen Emissions:
Potential Implications for Reducing Transmission of COVID-19, JAMA (2020),
https://jamanetwork.com/journals/jama/fullarticle/2763852 (accessed Apr 30,
2020).
[19] See also, e.g., Ruiyun Li et al., Substantial undocumented infection
facilitates the rapid dissemination of novel coronavirus (SARS-CoV2), SCIENCE
(2020), available at https://cutt.ly/AtNrCxH.
[20] Johns Hopkins University, Coronavirus, Social Distancing and Self-Quarantine,
https://cutt.ly/VtYYiDG.
[21] Harry Stevens, Why Outbreaks Like Coronavirus Spread Exponentially, and how
to "Flatten the Curve," WASH. POST, (Mar. 14, 2020), https://cutt.ly/etYRnkz.

from schools[22] to places of worship,[23] from businesses[24] to legislatures[25]—has been exhorted or ordered to reduce the number of people in close quarters, if not to empty entirely.[26] The State of Indiana has issued an extraordinary series of orders pushing back and amending election processes, closing private businesses, cancelling sporting events, shuttering schools, and ordering people to stay at home.[27] People also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces, using products with particular alcohol contents, and closing off any areas used by a sick person.[28]

24. Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in

---

[22] Centers for Disease Control and Prevention, Interim Guidance for Administrators of US K-12 Schools and Child Care Programs, https://cutt.ly/ItRPq5n.
[23] Centers for Disease Control and Prevention, Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/KtRPk1k.
[24] Centers for Disease Control and Prevention, Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/stRPvg4.
[25] Nat'l Conf. of State Legislatures, Coronavirus and State Legislatures in the News, https://cutt.ly/4tRPQne.a
[26] As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus. See Sarah Mervosh, Denise Lu, Vanessa Swales, Which States and Cities Have Told Residents to Stay at Home, N.Y. Times (last updated Apr. 3, 2020), available at https://cutt.ly/CtDMZY0.
[27] Goveror Eric J. Holcomb Indiana Stay-At-Home Order (April 27, 2020), available at https://www.in.gov/gov/3232.htm.
[28] Centers for Disease Control and Prevention, Cleaning and Disinfecting Your Facility, https://cutt.ly/atYE7F9.

other vital organs including the heart and liver.[29] Even if a person survives COVID-

19, the virus can permanently damage lungs, heart, and other organs.[30]

25.     Approximately 1 out of 5 people who are infected with COVID-19 will

need to be hospitalized, and many of those will need intensive care.[31] Such intensive

care often requires highly specialized equipment like ventilators that are in limited

supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient

ratios, respiratory therapists, and intensive care physicians.[32]

26.     COVID-19 can also mean death.  Worldwide, more than 234,000

people have already died from COVID-19, and that number grows each day.[33] People

nearing and over the age of fifty face a greater risk of serious illness or death from

---

[29] Centers for Disease Control and Prevention, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), https://cutt.ly/etRPVRl.

[30] Melissa Healy, Coronavirus infection may cause lasting damage throughout the body, doctors fear, LA TIMES (Apr. 10, 2020), available at https://cutt.ly/htNrJ77; see also Di Wu et al., Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19, MEDRXIV 2020.04.05.20053819 (2020). For high-risk patients who survive, the effect of contracting this virus can be permanent and debilitating, and can include "profound deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity." Declaration of Dr. Jonathan Golob, Dawson v. Asher, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at https://cutt.ly/AtNrFOl.

[31] See also Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020) available at https://cutt.ly/stERiXk

[32] Kevin McCoy and Katie Wedell, 'On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients, USA TODAY (Mar. 27, 2020), available at https://bit.ly/2V7rLsS.

[33] World Health Organization, COVID-19 Dashboard, https://who.sprinklr.com/

COVID-19.[34] However, people of all ages can get seriously ill or die.  In fact, over half of the people hospitalized for COVID-19 have been under 65 years old.[35]

### B. The Dangers of COVID-19 are Heightened in Prisons

27.      The imperatives of social distancing and hygiene apply with special force to prisons, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation.  Yet persons who live or work in prisons face a particularly acute threat of illness, permanent injury, and death, beyond that faced by the general public.

28.      The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community. And as one federal court in Pennsylvania has already noted, in a case dealing specifically with the ongoing crisis in prisons: "Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities."[36]

29.      A Federal Judge in the Northern District of Ohio recently ordered that prison officials in the Elkton Federal Correctional Institute identify prisoners to be

---

[34] Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis, MEDRXIV (Mar. 20, 2020), https://cutt.ly/etRAkmt.

[35] Centers for Disease Control and Prevention Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020 (updated Mar. 26, 2020), https://cutt.ly/ztB53U1; see also Robin McKie, Why do some young people die of coronavirus?, THE GUARDIAN (Apr. 5, 2020), available at https://bit.ly/2x5dghp.

[36] United States v. Rodriguez, No. 2:03-cr-0271, 2020 WL 1627331, (E.D. Pa., Apr. 1, 2020).

transferred by compassionate release, parole or community supervision, transfer furlough due to the inherent danger of COVID-19 in the prison.[37]

30.     People in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19 as already evidenced by the rapid spread of the virus in even less crowded environments than prisons, such as cruise ships[38] and nursing homes.[39]

31.     Because they are forced to exist in close, shared spaces for eating, sleeping, and bathing, it is impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing required to mitigate the risk of transmission.  High numbers of shared contact surfaces, limited access to medical care, and high numbers of people with chronic, often untreated, illnesses living in close proximity with each other exacerbate the dangers in detention settings.[40]

---

[37] Wilson, et al v. Mark Williams, et al, No. 4:20-cv-00794 Order Filed: 04/22/2020
[38] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." Centers for Disease Control and Prevention, COVID-19 and Cruise Ship Travel, https://cutt.ly/7tEEQvT.
[39] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. Centers for Disease Control and Prevention, Preparing for COVID-19: Long-term Care Facilities, Nursing Homes, https://cutt.ly/7tEEITH.
[40] Letter from Johns Hopkins Faculty at 1, https://cutt.ly/DtB6tkA ("The close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely. Soap and hand sanitizers are not freely available in some facilities.").

32.     Numerous public health experts have publicly warned that people held in correctional facilities are likely to face serious, even grave, harm due to the outbreak of COVID-19. Such experts include:

☐ Dr. Gregg Gonsalves, a professor at Yale School of Public Health;[41]

☐ Dr. Ross MacDonald, Chief Medical Officer for Correctional Health Services;[42]

☐ Dr. Marc Stern, an affiliate faculty member at the University of Washington School of Public Health and a correctional health care consultant,[43]

☐ Dr. Oluwadamilola T. Oladeru, a resident physician in the Harvard Radiation Oncology Program at Massachusetts General Hospital, and Adam Beckman, a student at Harvard Medical School,[44]

☐ Dr. Homer Venters, former chief medical officer of New York; [45]

the faculty at Johns Hopkins schools of nursing, medicine, and public health,[46] and

---

[41] Kelan Lyons, Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak, CONNECTICUT MIRROR (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[42] Craig McCarthy and Natalie Musumeci, Top Rikers Doctor: Coronavirus 'Storm is Coming,' New York Post (March 19, 2020, 11:29 a.m.), https://cutt.ly/ptRSnVo.

[43] Marc F. Stern, MD, MPH, Washington State Jails Coronavirus Management Suggestions in 3 "Buckets," Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

[44] Oluwadamilola T. Oladeru, et al., What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind, HEALTH AFFAIRS (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[45] Madison Pauly, To Arrest the Spread of Coronavirus, Arrest Fewer People, MOTHER JONES (Mar. 12, 2020), https://cutt.ly/jtRSPnk

[46] JHU Faculty Express Urgent Concern about Covid-19 Spread in Prison, Johns Hopkins Berman Institute of Bioethics, (Mar. 25, 2020) https://bioethics.jhu.edu/news-events/news/jhufaculty-express-urgent-concern-about-covid-19-spread-in-prison/

 Dr. Josiah Rich, a Professor of Medicine and Epidemiology at Brown University.[47]

33. Furthermore, as of February 29, 2020, at the peak of the outbreak in Wuhan, China—the city where COVID-19 originated—over half of all new infection cases were incarcerated people.[48] On Rikers Island, the rate of infection among incarcerated people is over eight times the rate of infection in New York City generally, and 45 times higher than the rate in Wuhan.[49] Fourteen prisoners have died of COVID-19 in Bucks County, Pennsylvania.[50] Six incarcerated people have already died of the disease at FCI Oakdale, a similar facility in Louisiana.[51] An Ohio corrections officer has also passed away.[52]  In Indiana, several inmates and correctional officers have died.[53]

---

[47] Amanda Holpuch, Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons, THE GUARDIAN (Mar. 13, 2020) https://cutt.ly/itRSDNH.

[48] Zi Yang, Cracks in the System: COVID-19 in Chinese Prisons, THE DIPLOMAT (March 9, 2020), available at https://cutt.ly/ctB6ieT.

[49] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. See Legal Aid Society, Analysis of COVID-19 Infection Rate in NYC Jails (last visited Apr. 5, 2020, 3:00 p.m.), available at https://cutt.ly/RtYTbWd.

[50] Press Release, Bucks County, PA, Larry R. King, Bucks County COVID-19 Deaths Reach 14; Four Cases Confirmed at Prison (Apr. 4, 2020), available at https://cutt.ly/utD6u5F.

[51] Sixth inmate death from COVID-19 reported at FCI Oakdale I, KALB (Apr. 10, 2020, 2:22 pm), https://cutt.ly/htB6ahx

[52] Ohio Dep't of Rehabilitation and Correction, COVID-19 Information (updated Apr. 11, 2020), available at https://cutt.ly/ZtB6hMN.

[53] 9 inmates have died at Indiana prisons from COVID-19 https://www.theindychannel.com/news/coronavirus/nine-inmates-have-died-at-indiana-prisons-from-covid-19

34.     Petitioner fears for his life.  He remains housed in dangerous conditions, and his concerns are being ignored.  Solidary confinement can be just as lethal as the disease itself.

**C. Immediate Relief is Needed to Prevent Further Unnecessary Suffering and Loss of Life**

35.     The growing numbers of ill and dead at Wabash Valley Correctional Facility make it clear that current measures being taken by the Governor and the Commissioner of the Department of Corrections are not sufficient in strength nor impact to adequately protect its staff, its prisoners, or the public.

36.     The death rate Wabash Valley Correctional Facility will increase substantially before it starts to diminish without major interventions.

37.     Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody.[54]

38.     The outbreaks in corrections facilities around the country underscore the need for immediate and significant reductions in population.  Courts and executive branch officials elsewhere in the country have accepted this reality and begun broad-based, categorical releases.[55] Internationally, governments and jail staff have recognized the threat posed by COVID-19 and released high numbers of

---

[54] Josiah Rich, Scott Allen, and Mavis Nimoh, We must release prisoners to lessen the spread of coronavirus, WASHINGTON POST (Mar. 17, 2020), available at https://wapo.st/2JDVq7Y.
[55] See, e.g., Memorandum and Order, Thakker v. Doll, No. 1:20-CV-0480 (M.D.Pa. Mar. 31, 2020) at Doc. No. 47 (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19).

detained persons.[56] Domestically, jail administrators in Marion County, Indiana,[57] Cuyahoga County, Ohio;[58] San Francisco, California;[59] Jefferson County, Colorado;[60] and the State of New Jersey,[61] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.  The Governor in Indiana on the other hand refuses to release inmates to fight COVID-19.[62]

39.     At least two federal courts have already issued orders releasing prisoners.  Deciding that release was the only acceptable option, the Court noted that even lengthy prison sentences "did not include incurring a great and unforeseen risk of severe illness or death."[63]

40.     Delay has already likely cost lives and led to needless suffering from COVID-19 at Wabash Valley Correctional Facility but it is not too late to act.  Without significant action, the conditions at Wabash Valley Correctional Facility will escalate

---

[56] In Iran, for example, more than 85,000 people were released from jails to curb the spread of coronavirus. US Jails Begin Releasing Prisoners to Stem COVID-19 Infections, BBC NEWS (Mar. 19, 2020), https://cutt.ly/9tRDyb3 (noting Iran's release of over 85,000 prisoners in response to the virus).

[57]  County jails release non-violent inmates to reduce coronavirus threat https://fox59.com/news/coronavirus/county-jails-release-non-violent-inmates-to-reduce-coronavirus-threat/

[58] Scott Noll, Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic, NEWS5 CLEVELAND (Mar. 20, 2020), https://cutt.ly/CtRSHkZ.

[59] Megan Cassidy, Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26, SAN FRANCISCO CHRONICLE (Mar. 20, 2020), https://cutt.ly/0tRSVmG.

[60] Jenna Carroll, Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns, KDVR COLORADO (Mar. 19, 2020), https://cutt.ly/UtRS8LE.

[61] Erin Vogt, Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads, NEW JERSEY 101.5 (Mar. 23, 2020), https://cutt.ly/QtRS53w.

[62] Indiana lawyers ask Holcomb to release prisoners vulnerable to coronavirus https://www.indystar.com/story/news/crime/2020/04/21/indiana-coronavirus-lawyers-ask-holcomb-release-some-inmates/2996482001/

[63] *Id.*

further, and many more incarcerated individuals and staff will become infected and will face elevated risks for medical complications and mortality.  Because the Respondents have failed to act, immediate judicial intervention is necessary to prevent the continued unconstitutional exposure of Petitioner to serious illness and death.

## V.  ARGUMENT

### A. Petitioner's Incarceration Amid the COVID-19 Outbreak in Wabash Violates his Rights to Constitutional Conditions of Confinement

41.     Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Indeed, under the Eighth Amendment, prison officials "must provide humane conditions of confinement . . . must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" Id. at 832 (internal quotation marks omitted).  The Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, protects prisoners from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 347(1981), including both hazardous prison conditions, see *Farmer v. Brennan*, 511 U.S. 825, 832, (1994), and grossly inadequate medical care, see *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  This obligation also requires corrections officials to address prisoners' serious medical needs—including needs far less dire than those at stake here.  See *Brown v. Plata*, 563 U.S. 493, 531-32 (2011); see also *Helling v. McKinney*, 509 U.S. 25, 28, 35 (1993) (prisoner stated a

valid Eighth Amendment claim against prison officials who required him to share

cell with a prisoner who exposed him to high levels of second-hand smoke)

42.     This obligation requires corrections officials to protect incarcerated

people from infectious diseases like COVID-19; officials may not wait until someone

tests positive for the virus and an outbreak begins. *McKinney*, 509 U.S. at 33-34

("That the Eighth Amendment protects against future harm to inmates is not a novel

proposition . . . It would be odd to deny an injunction to inmates who plainly proved

an unsafe, life-threatening condition in their prison on the ground that nothing yet

had happened to them"); *Board v. Farnham,* 394 F.3d 469, 487 (7th Cir. 2005)*.*

(prisoners have a constitutional right to adequate healthy air ventilation; see also

*Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of

self-protection and foreclosed their access to outside aid, the government and its

officials are not free to let the state of nature take its course."). By then it is too late.

That one individual would have almost certainly infected untold numbers of people

before displaying symptoms.

43.     Prison officials violate this affirmative obligation by showing

"deliberate indifference" to the substantial risk of serious harm. *Farmer*, 511 U.S. at

828.  Deliberate indifference is a subjective standard.  *Johnson v. Snyder*, 444 F.3d

579, 585 (7th Cir.2006).  To demonstrate deliberate indifference, a plaintiff must

show that the defendant "acted with a sufficiently culpable state of mind,"

something akin to recklessness.  *Id.*  A prison official acts with a sufficiently culpable

state of mind when he knows of a substantial risk of harm to an inmate and either

acts or fails to act in disregard of that risk.  *Roe v. Elyea*, 631 F.3d 843, 857 (7th

18

Cir.2011).  Deliberate indifference "is more than negligence and approaches intentional wrongdoing."  *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.1998).  In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir.2008).  A prisoner, however, "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir.2002); see also *Duckworth*, 532 F.3d at 679 ("[A]lthough deliberate means more than negligen[ce], it is something less than purposeful."). Nor does a prisoner need to show that he was literally ignored. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir.2005).

44.     With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33, 36 (holding that a prisoner "states a cause of action … by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health"); see also *Hutto v. Finney*, 437 U.S. 678, 682-685 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

45.     Here, COVID-19 is sure or very likely to cause serious illness, and even waiting until internal mitigation efforts are further futilely attempted may be too long.  Respondents are aware of the risk, which is obvious, significant, and severe.

46.     As noted above, there are no mitigation efforts that Wabash could undertake that would prevent the risk of contraction—and possible later spread to the non-prison community—to any acceptable degree, other than immediate release of the Petitioner to home confinement.  Respondents are aware that they are unable to control the spread of COVID-19 in Wabash, yet have failed to take effective action to protect prisoners or staff from further infection.

47.     Accordingly, Wabash's failure to take medically-required steps to prevent disease and death constitutes deliberate indifference. Their nominal gestures—as by sending directives to the prisoners to engage in social distancing where it is flatly impossible to do so—do not suffice.  See, e.g., *Helling*, 509 U.S. at 33, 36.

**B.  This Petition is an Appropriate Vehicle to Remedy these Violations**

48.     Section 2241(c)(3) allows this court to order the release of a prisoner like Petitioner who is held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself); cf. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages.  A successful habeas petition

would have required officials to place respondents in less-restrictive conditions immediately[.]").

49.     "[A]n attack upon the execution of a sentence [as opposed to an attack on the validity of the conviction itself] is properly cognizable in a 28 U.S.C. § 2241(a) habeas petition." *United States v. Ford,* 627 F.2d 807, 813 (7th Cir. 1980)

## V. CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**

50.     Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment.  As part of the right, the government must protect incarcerated persons from a substantial risk of serious harm to their health and safety. See, e.g., *Farmer*, 511 U.S. at 828; *Estelle*, 429 U.S. at 104. Petitioner faces a substantial risk of serious harm from COVID-19. Respondents are aware of the serious risk COVID-19 poses to Petitioner yet have failed to take meaningful action to reduce the population of Wabash and mitigate the risk of harm to Petitioner. Respondents are therefore deliberately indifferent to that risk and violate Petitioner's constitutional rights.

51.     Wabash Correctional Facility has neither the capacity nor the ability to comply with public health guidelines to manage the outbreak of COVID-19 currently ravaging the facility and absent relief measures requested herein, cannot provide for the safety of Petitioner.

52.     Respondents' actions and inactions result in the confinement of Petitioner in a prison where Respondents have not followed and seem incapable of

following public health guidance regarding social distancing and personal hygiene, and treating or preventing COVID-19 outbreaks and deaths, all of which violates Petitioners' rights to be free from deliberate indifference to a substantial risk of serious harm—that is, to receive adequate treatment and medical care, and social distancing in the face of COVID-19.

53.     By failing to implement controls necessary to contain the COVID-19 outbreak and stop preventable deaths at Wabash, Respondents have violated Petitioner's Eighth Amendment rights.

## VI. REQUEST FOR RELIEF

54.     Petitioner respectfully request that the Court order the following:

 Pursuant to 28 U.S.C. § 2243 and issued forthwith:

1.  A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Respondents to place Petitioner outside of the Wabash Valley Correctional Facility and place Petitioner on home confinement within twenty-four (24) hours until such time that there is a cure or vaccine for COVID-19.

2.  Award Petitioners costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable laws; and

3.  Any further relief this Court deems just, necessary, or appropriate.


Dated:   18May2020                                    Respectfully submitted,


                                                       /Kofi M. Ajabu
                                                      Kofi Ajabu, Pro se Petitioner